**In re STOP–N–GO OF ELMIRA, INC., Debtor.**

**John B. LAWLESS, as Trustee of Stop-N-Go of Elmira, Inc., Plaintiff,**

v.

**STOP–N–GO FOODS, INC., Defendant.**

Bankruptcy Nos. 79–327, 80–164A.

United States Bankruptcy Court, W.D. New York.

Oct. 20, 1982.

Lacy, Katzen, Ryen & Mittleman by Peter T. Rodgers, David D. MacKnight, Rochester, N.Y., for plaintiff.

Block, Colucci, Callanan, Crangle & Stachowiak by Anthony J. Colucci, Buffalo, N.Y., for defendant.

## MEMORANDUM AND DECISION

EDWARD D. HAYES, Bankruptcy Judge.

This is an action by the trustee in bankruptcy to recover some $62,180.83 paid to the defendant by the debtor within four months prior to the filing of the petition in bankruptcy. The first cause of action is for a preference under § 60 of the Bankruptcy Act. The second cause of action is to recover the fraudulent transfer under § 67(d) of the Bankruptcy Act. The case has been pretried and tried and the matter is now ready for decision.

It appears that the debtor in this particular matter entered into a franchise agreement with the defendant on or about October, 1969. The contract entered into between the debtor and the defendant in October of 1969 which had been modified at least twice during the ensuing years contains a clause, paragraph 8A, which read as follows:

> "Whenever the applicant deems it necessary because of economic conditions and/or a failure on the part of Marketing Merchandisers Inc. to perform their contract obligations, after one year from the date of this agreement, upon three months advance written notice, the applicant may cancel further participation under this agreement and the franchize.

Thereafter both parties shall be free of any further obligations hereunder other than the obligation of the applicant to pay the "Guaranteed Annual Franchize Fee" pro rata up to the effective date of cancellation and to provide appropriate operating statements for the franchize period, if requested." *

The debtor operated some 26 stores under this franchise agreement which began in 1969 and was terminated in 1978. In November of 1977, the debtor granted the defendant a 120 day period to exclusively negotiate for the purchase of the debtor's assets. Prior to that time, the two presidents of the corporations here involved had met and discussed the possible acquisition by the defendant of the debtor's company. From November of 1977 through May of 1978, the defendant investigated the debtor. The books of the debtor were made available to the defendant and an analysis of the debtor's business was made by the defendant and people in their employ either as direct employees or as hired consultants. In June of 1978, the defendant made an offer to purchase the debtor for about $800,000. This was turned down by the debtor and they began to look around for somebody else to purchase the company.

In July or August of 1978, the debtor made contact with Southland Corporation which operates the Seven Eleven stores. As a result of that contact, an agreement was reached between the debtor and Southland Corporation for the purchase of the assets of the debtor in October of 1978. Closing was to be held in December of 1978. The defendant was advised of this offer.

After Mr. Johnson, president of Stop-N-Go Foods of Ohio, the defendant herein, heard of the proposed sale to Southland Corporation, he indicated to Mr. Butler, president of the debtor herein, that Stop-N-Go Foods of Ohio had a claim for cancellation of the contract which would have to be taken care of prior to the time that Southland acquired the assets of the debtor corporation. In the middle of November of 1978, Mr. Butler formally advised Mr. Johnson that they were going to sell to Southland and they were cancelling the agreement with the defendant herein. On December 1st, the attorney for the debtor herein wrote a formal letter to the defendant herein advising them that because of the economic conditions which were set forth in clause 8A, the debtor was cancelling the contract as of three months from that date.

Subsequently, Southland, Stop-N-Go of Elmira and Stop-N-Go of Ohio and representatives of Stop-N-Go of Ohio's holding company, Sun Oil, met in Philadelphia on December 13, 1978. At that point in time, the record is clear that the defendant corporation through its officers, employees and consultants had knowledge that the debtor company was in serious financial difficulties. The defendant knew at that point in time that there had been losses by the debtor corporation in 1976, 1977 and 1978. They knew that there were large reported unpaid sales taxes totaling over $300,000. Stop-N-Go of Ohio knew that there were accounts receivable owed to subsidiaries of the defendant totaling roughly around $200,000. They knew that poor records were kept by the debtor.

At this meeting of December 13, 1978, an agreement was entered into to cancel future franchise fees for the sum of $50,000 and there was an agreement made that $12,180.83 owing in back franchise fees for the past five or six months would be paid by the debtor when the closing with Southland occurred in December of 1978. The closing occurred December 29, 1978 and the defendant herein received the sum of $12,180.83 in back franchise fees and $50,000 for its release of the future franchise payment agreement. Southland Corporation purchased the assets of the debtor herein on that day for $1,300,000. The $1,300,000 went to pay secured creditors, priority lienors and to make certain payments which have been categorized as preferential. There was left between $5,000–$7,000, de-

---

* Note the misspelling of franchise is contained in the exhibit. Applicant is the debtor. Stop-N-Go of Ohio is a successor in interest of Marketing Merchandisers Inc.

pending upon which witness you would believe, to divide amongst the remaining $1,100,000 worth of unsecured creditors.

On January 30, 1979, an involuntary petition was filed against Stop-N-Go of Elmira, Inc., the debtor herein, and it was thereafter adjudicated a bankrupt.

The elements of a preference are set forth in the 14th Edition of Collier on Bankruptcy, Volume 3, Part 2 at page 758 and 759 and they are described as follows:

Briefly stated, the elements of a preference under § 60a consist of the following: a debtor (1) making or suffering a transfer of his property, (2) to or for the benefit of a creditor, (3) for or on account of an antecedent debt [resulting in a depletion of the estate], (4) while insolvent, and (5) within four months of bankruptcy or of the original petition under Chapters X, XI, or XIII of the Act, (6) the effect of which transfer will be to enable the creditor to obtain a greater percentage of his debt than some other creditor of the same class. The creditor's knowledge or reasonable cause to believe that a preference is effected by a transfer to him is no longer an element in determining whether such transfer constitutes a preference under subdivision a of § 60. However, under subdivision b a preference is voidable by the trustee in bankruptcy only upon proof of the additional element that (7) the creditor receiving or to be benefited by the preference had reasonable cause to believe that the debtor was insolvent. . . .

The applicable section of 67d provides in part as follows:

(3) Every transfer made and every obligation incurred by a debtor who is or will thereby be rendered insolvent, within four months prior to the filing of a petition initiating a proceeding under this Act by or against him is fraudulent, as to then existing and future creditors: (a) if made or incurred in contemplation of the filing of a petition initiating a proceeding under this Act by or against the debtor or in contemplation of liquidation of all or the greater portion of the debtor's prop-

erty, with intent to use the consideration obtained for such transfer or obligation to enable any creditor of such debtor to obtain a greater percentage of his debt than some other creditor of the same class, and (b) if the transferee or obligee of such transfer or obligation, at the time of such transfer or obligation, knew or believed that the debtor intended to make such use of such consideration. The remedies of the trustee for the avoidance of such transfer or obligation and of any ensuing preference shall be cumulative: Provided, however, That the trustee shall be entitled to only one satisfaction with respect thereto.

. . . . .

(6) A transfer made or an obligation incurred by a debtor adjudged a bankrupt under this Act, which is fraudulent under this subdivision d against creditors of such debtor having claims provable under this Act, shall be null and void against the trustee, except as to a bona fide purchaser, lienor, or obligee for a present fair equivalent value: . . .

■ With regard to the transfer of $12,180.83, there is no question but that $12,180.83 was transferred to the defendant on December 29, 1978. It was for franchise fees that had been due since July or August of 1978. The transfer was made while the debtor was insolvent because it is clear that after the payments of the secured creditors and certain other so called preferences there was only $5,000–$7,000 to divide between the $1,100,000 of unsecured creditors. The payment was made within four months of bankruptcy. The effect of the transfer was to enable the defendant, an unsecured creditor for this amount, to receive 100 cents on the dollar while the rest of his class, $1,100,000 of unsecured creditors, had to split $5,000–$7,000 amongst themselves. As a result of their investigation of the debtor, the defendant had sufficient information to give them reasonable cause to believe that the debtor was or could be insolvent and certainly they were advised of that fact in the meeting of December 13, 1978 which was a couple weeks prior to the

transfer. Therefore, the payment of the $12,180.83 is clearly a preference and must be returned to the trustee to be divided amongst the other creditors.

The transfer of the $50,000 for and in consideration of a release of the balance of the franchise agreement presents a problem under § 67d. The $50,000 was transferred on December 29, 1978 well within the four months of the filing of the petition in bankruptcy. This transfer was made as a result of an agreement reached on December 13, 1978, again within four months, by which the debtor agreed to a compromise of the defendant's cause of action against him for an anticipatory breach of the franchise agreement. The breach may have occurred by failure to pay the franchise fees or by the cancellation notices of November and December of 1978 but as of December 13, 1978, it was an unsecured claim at best. On December 13, 1978 and December 29, 1978, both the debtor and the defendant knew that the agreement between them was in furtherance of a scheme or a proposal to liquidate all of the debtor's property. Fifty thousand dollars of the amount for which they were liquidating the property was to enable the defendant herein, an unsecured creditor, to obtain a greater percentage of his debt than the other unsecured creditors. Subdivision 67(d)(6) says "that such transfer shall be null and void as against the trustee, except as to a bona fide purchaser, lienor or obligee for a present fair, equivalent value".

In this case, the debtor and the defendant both knew that the debtor was liquidating. They both knew or should have known that the payment to the defendant of the $50,000 would be more than other unsecured creditors would get as a result of the sale to Southland. They both knew or should have known that Southland intended to operate the stores of the debtor under its trade name of Seven Eleven as opposed to Stop-N-Go. To ask this Court to categorize such a transfer as being a transfer to a bona fide purchaser for a present fair, equivalent value is too much. The defendant knowingly converted his unse-

cured debt for future franchise payments which were of no use to the debtor or to the debtor's estate to a cash payment. When clause 8A of the original franchise contract is taken into account, this agreement of December 13, 1978 may well be the payment of 20½ months franchise payments to relieve the debtor from an obligation to make three franchise payments totaling about $7,300. Such a payment is in fraud of creditors and should be set aside.

In light of these conclusions, the plaintiff should receive the sum of $62,180.83 from the defendant with interest thereon from December 29, 1978 to date together with the costs and disbursements of this action and it is so ordered.